Filed 8/26/25  P. v. Leal CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D083232 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD274517) |
| AMBER LEAL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Jeffrey F. Fraser, Judge.  Affirmed.

Christine M. Aros, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Amber Leal of the first-degree murder (Pen. Code, § 187, subd. (a))[1] of Alexandria Smith in a trial with codefendants Jonnie Isaguirre and Pablo Valadez. The jury could not reach a verdict as to Leal's codefendants. The jury found true the special circumstance allegations that Leal committed the murder while engaged in the commission of robbery (§ 190.2, subd. (a)(17)(A)) and torture (§ 190.2, subd. (a)(18)). The court sentenced Leal to life in prison without the possibility of parole.

Leal makes three main arguments on appeal. First, she contends there is insufficient evidence to support her first degree murder conviction and the special circumstance findings. Second, she argues the court prejudicially erred by responding to a jury question about robbery by instructing that consent for the use of property may or may not be revoked upon death. Finally, Leal asserts that the trial court erred in its instructions to the jury on the torture special circumstance.

We reject Leal's sufficiency of evidence challenges to the felony murder theory of first degree murder with robbery as the underlying felony (§ 189, subd. (a)) and the related robbery special circumstance. We therefore do not need to decide whether sufficient evidence supports the conviction on any other theory. We further conclude that, even assuming any error in the court's answer to the jury's question about revocation of consent for a taking of property, it was harmless on this record. Accordingly, we find no reversible error in the first degree murder conviction and the robbery special circumstance. Because the existence of a single valid special circumstance mandates Leal's sentence of life without possibility of parole (§ 190.2, subd. (a)), we need not address the validity of the additional torture special circumstance. We therefore affirm the judgment.

---

[1]     Undesignated statutory references are to the Penal Code.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Prosecution's Case*

   1. *Smith Goes Missing*

   In early October 2017, Smith was living with her mother, Nicole, and her daughter near San Diego State University. Isaguirre had been staying at the house with Smith for about two weeks, and Nicole believed Smith and Isaguirre were just friends and had known each other for about two weeks.

   On October 2, Smith and Isaguirre left the house at approximately 11:00 p.m. in Nicole's gray Toyota Corolla. They told Nicole they were going to a party in National City. Nicole believed Smith would be back in time to pick up her daughter from where she was staying at her father's house to take her to school the next morning. However, when Nicole woke up on the morning of October 3, Smith was not home. Smith's daughter called Nicole and said Smith had not picked her up for school. Nicole texted and called Smith's phone, but it went straight to voicemail. When Nicole still had not heard from Smith by 5:00 p.m. that day, she contacted police to report Smith missing.

   2. *Initial Police Investigation and Discovery of Smith's Car and Body*

   Norma S. and her husband Michael lived in National City next door to Leal. Leal was married to Norma's brother, Eddie "Fester" Suarez, but they were not living together at the time. At around 5:30 a.m. on October 3, Michael saw a car speeding down their street. The car, a gray Toyota Corolla, parked outside of Leal's house and a male and female got out. Michael and Norma were unable to identify the two individuals. They had previously had police contact regarding Leal's residence, and the police had instructed them to take photographs of any suspicious activity at Leal's residence, so Michael took a picture of the car and its license plate when he

3

left for work at 7:30 a.m.  The license plate number matched Smith's gray Toyota Corolla.

At around 9:00 a.m. that day, Norma saw the same car backed into Leal's garage with the garage door halfway down nearly touching the hood of the car.  She saw someone who appeared to be the same man who got out of the car earlier in the morning, and she also heard Leal talking.  She did not hear any screaming that morning.

Later that night, a man searching through a 7-Eleven dumpster in Vista for recyclables found Smith's phone.  The next day, after taking the phone home and charging it, the man received a call on the phone and was told it belonged to a missing woman and he turned it over to police.

In the early morning of October 4, police responded to a call reporting that a man, later identified as Isaguirre, was loitering and acting strange at a gas station in Valley Center.  He had gloves hanging out of his back pocket.  Police contacted Isaguirre but then called his mother to pick him up.  Later that day, at 4:30 p.m., police arrested Isaguirre at his parents' home in Escondido.  Isaguirre told police he had known Smith for approximately one week and had last seen her several days earlier when she dropped him off in Spring Valley and never returned to pick him up.  He told police he did not know where Smith was.

On October 5, Michael and Norma contacted police after seeing a press release regarding a missing person that had a photograph of the car with a license plate number that matched the car they had seen outside Leal's home.  A National City police officer interviewed Michael and Norma that night about what they had seen.

On October 6 and 7, police searched Leal's home and Isaguirre's home and retrieved several cell phones, including two that Leal voluntarily handed

4

over to Sergeant Kenneth Springer, the primary investigator in the investigation of Smith's disappearance.

On October 9, police recovered Smith's car in Temecula. Inside the car, police located white rope, a red gas can, a tan tarp, some bags, an empty box, a can of Four Loko, and a blue towel. The car was processed for forensic evidence. The towel in the car had Smith's blood on it. A nearby resident had seen the car parked across from his apartment complex on October 4, and the car remained there for several days.

On October 12, police found Smith's body in a rural area in shrubbery near a fire road north of the Pala Casino. Smith's hands were bound with white duct tape and her fingertips were missing. A plastic Walmart bag had been taped around her head with multiple layers of duct tape. She was wearing different clothing from when she left her house on October 2.

On October 13, San Diego County medical examiner's office performed an autopsy of Smith's body and determined that the cause of death was asphyxiation and the manner of death was homicide. Under the bag taped around Smith's head, she had more duct tape taped directly onto her face, wrapped tightly around her eyes, nose, and mouth. All of her fingertips, with the exception of her right thumb, had been severed after she died. Toxicology results showed that there was methamphetamine, amphetamine, and alcohol in Smith's system.

3. *Follow-up Investigation and Charges*

In November 2017, the San Diego County district attorney's office charged Leal, Valadez, Isaguirre, Crystal Melendez, and Maria Pereira with the murder of Smith (§ 187, subd. (a)).

In an information filed in November 2019, the district attorney's office alleged that Leal, Valadez, and Isaguirre murdered Smith (§ 187, subd. (a)).

As to Leal, the information further alleged that she committed the murder while engaged in the commission of a robbery (§§ 211, 212.5, & 190.2, subd. (a)(17)) and a kidnapping (§§ 207, 209, 209.5, 190.2, subd. (a)(17)) and that the murder was intentional and involved the infliction of torture (§ 190.2, subd. (a)(18)).

4. *Cooperating Witness Pereira*

In November 2018, a district attorney investigator interviewed Pereira, who at that time was still one of the five defendants charged with Smith's murder. Pereira signed an agreement with the district attorney's office providing that she would cooperate fully in the investigation and prosecution of Smith's murder, plead guilty to one count of robbery, and be sentenced to five years in state prison in exchange for the dismissal of the remaining charges and allegations against her.

Pereira testified at trial on behalf of the prosecution. She met Leal and Isaguirre for the first time on the night of October 2, 2017. Pereira's friend Christopher Villanueva told her that Leal was going to be leaving her house, and that Pereira, who did not have anywhere to live at the time, would be able to stay there for about a month. Villanueva introduced the two women at Leal's house and then left.

Leal told Pereira that she needed to bail her boyfriend, "Droopy," whose real name is Daniel Perez, out of jail that night. Leal made several phone calls seeking money from people to use for Perez's bail, and she told Pereira that someone named Crystal had the money to bail him out and would be coming to Leal's house. Pereira gave Leal $80.00 in exchange for her Nintendo Wii. At around 7:00 p.m., Leal's two daughters went to sleep in their bedroom.

6

Crystal Lopez Melendez (Melendez) soon arrived at Leal's house, and the two women went into Leal's garage and got high. Pereira did not join because she was "in a program" at the time so she was sober. Melendez and Leal realized there had been a misunderstanding, as Melendez did not have bail money but rather had drugs that could be sold to raise the money. Leal stated that the new plan was to get the money by robbing someone.

About an hour-and-a-half after Melendez arrived at Leal's house, Isaguirre and Smith arrived. Leal knew Isaguirre but was not friends with Smith. Leal and Isaguirre went to go talk in the garage, but Smith did not want Isaguirre to be alone with Leal and she started screaming at them. Leal slapped Smith's face with the back of her hand, stating that her kids were sleeping and she did not want Smith to wake them up. Smith started crying and her nose was bleeding. Leal grabbed a towel and apologized to Smith. Leal told Smith that she would not do it again but not to be loud because she did not want the kids to wake up.

Leal, Melendez, Isaguirre, and Smith went into Leal's bedroom and closed the door while Pereira stayed in the living room. Pereira heard Smith scream. The four in the bedroom then came into the living room and Leal and Melendez left with Smith's car keys. Before Leal left the house, she told Pereira to keep Smith's phone away from her and not to let Smith call anyone or go anywhere. Leal also told Pereira, Smith, and Isaguirre not to leave the house.

Pereira joined Isaguirre and Smith in Leal's bedroom, where Smith was sitting on the bed with her elbows on her knees and her head down. She was upset and "lit out of her mind." Isaguirre and Smith were both smoking methamphetamines that night. At one point, when Smith asked Isaguirre to hit the pipe he was smoking, he laughed at her and said no. He said

7

something like he "had done this before" or that "it wasn't the first time," which made Smith cry.  She looked afraid.  Smith told Isaguirre she had to take her daughter to school in the morning, and she was worried about not picking her up in time.  Leal and Melendez had been gone for hours at that point.

While Pereira was watching Smith, she realized that Smith had been hiding her phone and using it.  After checking Smith's messages, Pereira saw that Smith had texted someone saying she was being held against her will in National City.  Pereira yelled at Smith and told her " 'I mean, I'm not holding you against your will.  You can leave right now if you want to.' "  Smith was crying.  Pereira called Leal and Melendez to tell them that Smith had texted someone reaching out for help.  Melendez told Pereira to get hold of Smith's friend and tell him everything was fine.  Melendez and Leal were upset and said they would be home shortly.

Pereira and Smith called Smith's friend to tell him everything was okay, but Smith sounded like she was upset or distressed, and she was still crying.  Isaguirre made Smith put the phone on speakerphone so that they could hear the call.  The man Smith called seemed busy and it sounded like he was at a casino.  Isaguirre made fun of Smith and laughed at her because the friend she called was not paying attention to her or helping her.  Isaguirre also told Smith, "See, I told you not to fuck with me.  I'm a gangster."

When Leal and Melendez returned to the house, they came into Leal's bedroom and Leal told Pereira to go back to the living room.  Melendez took Pereira's phone.  At some point, Leal came out to the living room briefly and told Pereira, " 'We have this bitch's car sold.' "

While Leal, Melendez, Isaguirre, and Smith were in Leal's bedroom with the door closed and Pereira was in the living room, Pereira heard Smith scream once. Leal and Melendez came out of the bedroom and Melendez told Leal not to kick Smith again. Leal was angry. She did not respond to Melendez, and then the two of them went back into the bedroom and closed the door again. At one point the bedroom door was briefly opened, and Pereira saw Smith sitting on the couch in Leal's bedroom, crying and wearing a black hooded sweatshirt she had not been wearing before.

Pereira had been texting her friend Villanueva a lot after he left Leal's house, "talking shit about how [Melendez] and [Leal] are crazy," and she was upset that he had left her at the house all night. Villanueva returned to the house in the early morning. Leal's daughters were awake at this point. He went into Leal's bedroom and loudly demanded to know what was going on. Eventually Pereira asked Villanueva to get her phone back from Melendez, and he did. Melendez had deleted the phone calls and texts from that morning from Pereira's phone.

Leal gave Pereira a plastic bag containing Smith's jacket and empty purse and told Pereira to get rid of it. Pereira left the house and walked to her aunt's house, as she lived nearby. Pereira gave Smith's jacket to her aunt and gave Smith's purse to Pereira's nieces. Pereira did not know what happened at Leal's house after she left.

On cross-examination, Pereira confirmed that when she was interviewed by police in October 2017, she told them that Melendez was the person calling the shots. Pereira also stated during that interview that both Leal and Melendez told Pereira to keep Smith at Leal's house and not let Smith use her phone.

At one point when Pereira was still a defendant in the case, she was placed in a cell across from Melendez. Melendez was saying to Pereira "that pretty much everything happened because of [Leal]." Pereira agreed that Leal was the one being aggressive the night of the murder and that she was the reason for all of this. Melendez asked Pereira to have her lawyer call Melendez's lawyer "so she could get a deal."

Pereira and Melendez were housed in the same jail at one point and developed a relationship through exchanging letters, telling each other they loved one another and talking about being each other's wives in prison. Pereira did not develop feelings for Melendez, but rather explained that it was just "jail stuff," as incarcerated individuals "get lonely and like to write to each other in boredom."

5. *Cooperating Witness Melendez*

In June 2019, Melendez signed a formal cooperation agreement with the district attorney's office. Melendez agreed to cooperate fully in the investigation and prosecution of Smith's murder, plead guilty to murder in the second degree in violation of section 187(a), and plead guilty to kidnapping in violation of section 207(a) in exchange for the dismissal of the remaining charges and allegations against her. The agreement provided that the district attorney's office agreed to limit the potential sentence for the kidnapping charge to a maximum of five years consecutive to the murder sentence of 15 years to life, but the ultimate decision to impose the additional three or five years consecutive to the 15 years to life would be at the discretion of the sentencing court.

Melendez testified that she pled guilty to murder and kidnapping Smith because she participated in Smith's murder and kidnapping. Melendez met Perez in 2007 when her dad was in a rehabilitation program

with him, and they reconnected around August 2017.  The two of them "had a really good relationship" and would always help each other out.  Melendez met Isaguirre through Perez about a month or two before Smith's murder, and the two of them hung out and got high on methamphetamine together a handful of times.  Melendez met Valadez, who introduced himself as "Risky," at a casino around the same time she met Isaguirre.  She hung out with Valadez six or seven times between when she met him and the night of Smith's murder.  Melendez and Valadez would smoke methamphetamine together and also had a sexual relationship that Melendez described as a "friends-with-benefits-type situation."  She also had a sexual relationship with Isaguirre at some point.

On October 2, 2017, Isaguirre called Melendez and told her Perez was in jail and he and Perez's "homegirl" Leal were trying to collect $1,300.00 to bail Perez out.  Melendez said she would help.  At around 5:00 p.m., Melendez got a call from Leal.  Melendez had never met or spoken to Leal before.  Leal said she had $80.00 and was expecting to get at least $500.00 later.  Melendez did not have much more than $20.00 and did not tell Leal she was going to bring money.  Melendez had seven grams of methamphetamine and intended to sell it and give the money to Leal for Perez's bail.  Melendez arrived at Leal's house at around 10:00 p.m.

Leal came out to meet her and seemed anxious.  Leal and Melendez were both frustrated when they realized Isaguirre had incorrectly told Leal that Melendez had cash for Perez's bail when in reality, she only had drugs they could sell to raise money.  Leal said the bail bondsman gave her until midnight to post bail, and Melendez called and got an extension until 1:30 a.m.  Melendez planned to get more drugs from her contact to sell and raise more money.

11

Isaguirre arrived approximately 45 minutes later, at a little before 1:00 a.m. on October 3, with Smith. They went into Leal's room, and Melendez and Isaguirre smoked methamphetamine. Smith seemed very anxious and nervous, like she did not want to be there.

Leal asked Isaguirre to help her with something in the garage and Smith got up to follow them and said she was going to go. Isaguirre told Smith to calm down and said he was going to help Leal and would be right back, but Smith was adamant about wanting to leave. Isaguirre and Leal were trying to talk Smith out of leaving, and she asked Isaguirre, "Why are you doing this to me?" Leal told Smith to be quiet because her daughters were asleep. Smith was upset, raised her voice, and said she wanted to leave. Leal told Smith she had woken up her daughter, and Isaguirre and Leal pushed Smith back into Leal's room. Melendez went back into the room a minute later and Smith's lip was bleeding. Leal said she had to hit Smith because she woke up her daughter.

Melendez's drug contact arrived, and she got another seven grams of methamphetamine and then was dropped back off at Leal's 30 to 45 minutes later. After being dropped off, she saw Leal in a car outside her house. Leal told Melendez that Isaguirre and Smith said they could use Smith's car in exchange for dope. They followed Melendez's drug contact back to a house to get more drugs. After getting the drugs, they went to a Soapy Joe's at around 2:30 a.m. to get gas, and then to another gas station to see whether Leal's public assistance money had been deposited into her account. At the second gas station, Leal ran into Villanueva and introduced him to Melendez. Leal asked him if he liked her new car, and they all laughed.

Leal and Melendez continued with their plan to go to Escondido where Melendez knew people to sell the drugs to so they could try to raise the bail

12

money, despite that the bail deadline had passed.  Leal and Melendez both smoked methamphetamine.  While they were in Escondido, Melendez got a text from an unknown number and asked Leal if she knew the number.  Leal looked upset, walked out, and started yelling at somebody on the phone.  Leal told Melendez they had to leave and that, " '[t]he bitch sent a text message saying she was being held against her will.' "

When Leal and Melendez arrived back at Leal's house, Leal was aggressive and yelling at Smith.  Melendez was upset and confused and asked Smith why she sent a text message saying she was being held hostage.  Smith said she did not know, but she was scared.  Smith said she sent the message to "her homeboy from Logan" who was named "Chunks" (Jose S.).  In response to this, Leal said she was going to call her brother-in-law, Valadez, for help.

Leal told Smith to change her clothes because she " 'need[ed] to look like a boy.' "  Leal did not want Smith to "look the same going out as she did coming in."  Leal's mood kept changing, and she yelled at Smith when she saw her upset and crying.  At one point, Leal kicked Smith in her upper chest or facial area.  Smith said a couple of times, " 'Just please let me go.  I won't say anything.' "  Smith appeared to be getting more and more nervous and scared.

Melendez left the bedroom at some point and when she returned about ten minutes later, Smith "was hog-tied on the bed with phone chargers."  She was laying on her stomach with her hands tied behind her back, her legs back, and her hands were tied to her legs.  Leal and Isaguirre were the only ones in the room with her.  Melendez got upset and yelled at Leal, asking her what she thought she was doing.  Leal said Smith would not stop crying or

13

shut up.  Leal stood by and laughed as Melendez took the cords off of Smith. Smith was shaking and crying.

Villanueva returned to the house after this, and he spoke privately with Leal.  Melendez, Isaguirre, and Smith smoked more methamphetamine while they were gone.  Melendez then asked to speak privately with Villanueva, and she told him that Leal "was trippin' on [Smith], that she had put hands on [Smith], and that she was acting crazy."  Villanueva pinned Leal against the wall and asked her what she was doing, said she needed to " 'stop trippin',' " and told her to calm down.  Leal responded by laughing and saying that nothing was going on and everything was cool.  Villanueva then left the house.  Pereira left around this same time.

Leal said she needed to talk to Valadez in person, so Melendez and Leal left the house to meet Valadez at Walmart.  They drove back to Leal's house in separate cars.  When Melendez and Leal arrived back at the house, Valadez was already walking out of Leal's bedroom.  Valadez said, " 'Well, you gotta kill her.' "  Valadez said it in a nonchalant, joking manner, and Melendez did not take it seriously.

Isaguirre, Melendez, and Valadez smoked methamphetamine in the living room, and Leal went into the bedroom where Smith was.  Valadez also went back into the bedroom, and soon after, Melendez heard a commotion. Melendez went to the bedroom and saw Valadez laying on top of Smith, pinning her down while Leal tried to put a syringe with brown liquid into Smith's arm.  Smith was struggling to fight back.  Leal told Melendez it was a "hot shot" of nicotine and water, and she saw it in a YouTube video.  At some point, Leal gave up trying to give Smith the hot shot, and Leal and Valadez went somewhere to talk.  Valadez came back and told Melendez he wanted her to go to the store with him.

At around 10:00 a.m., Melendez and Valadez took Smith's car and went to another Walmart. Melendez was on the phone while Valadez was shopping and did not pay attention to what he was getting except for duct tape. Back in the car, Melendez also saw a tarp and a gas can. At that point, Melendez was concerned about how serious the situation was getting and thought "it wasn't looking good" for Smith, but she did not voice her concerns to the others.

When they returned to the house, Melendez went inside and heard a loud struggle from the bedroom. Isaguirre and Melendez went to the room and saw Leal and Smith fighting. The room was trashed and there was broken glass on the floor. Melendez helped Leal grab Smith and told Smith to calm down. During the struggle, Smith was swinging and scratched Melendez's chest. After Smith had been pulled down to the bed, "the fight kinda left her." Melendez went to the garage to get Valadez for help.

Leal said they all had to leave her house before her landlord or family heard anything, because things were getting out of control. Valadez said they should put Smith in the trunk, but Leal said no because her neighbors would see. Leal went back to her bedroom to try to calm Smith down, "telling her that if she was quiet and if she left willingly . . . that she would make it out okay." Smith started crying and said she would not say anything if they let her go and that they could keep her car. Leal eventually convinced Smith to leave with them willingly. Smith told Isaguirre that if anything happened to her, he was the last person she had sex with.

They all walked out to the garage and got into the car. Valadez drove, Melendez was in the front passenger seat, and Smith, Leal, and Isaguirre were in the back seat, with Leal in the middle seat. Valadez drove to a secluded area in Julian. On the way, Smith tried to open the door on the

freeway and Leal grabbed her, cussed at her, and made her switch to the middle seat. Leal was yelling, cussing at Smith, and calling her names during the entire drive. Valadez asked if Isaguirre had his gun in the car, and Isaguirre told Melendez it was in the trunk but was not loaded.

When the car stopped, Melendez, Valadez, and Isaguirre got out and Leal sat in the back with Smith. At some point after they got out of the car, Valadez put gloves on. Leal told Smith to calm down, that she was going to let her go, but she had to tie her up to make sure they had time to get away. Smith was pleading with Leal to let her go and that she would not say anything, but Leal said she could not trust her because she tried to jump out of the car on the freeway. Leal leaned over the front seat and grabbed tape from a bag, sat on Smith's lap straddling her, and started taping her hands together. Smith was crying and begging Leal to let her go, but she did not struggle as Leal taped her hands and wrists.

Leal then asked Isaguirre to hand her the plastic Walmart bag, shook out the contents, and put the bag on Smith's head. After Leal put the bag on Smith's head and started putting tape around her neck, Smith began screaming and struggling, and both women fell over onto their sides in the back seat. Leal then jumped out of the car and told Isaguirre to "finish it" or " 'finish her.' " Isaguirre got in the car and laid across Smith, holding her down. Smith was struggling, trying to get Isaguirre off of her. After a couple of minutes, Smith stopped moving. Isaguirre got out of the car, and Melendez knew at that point Smith was dead.

Valadez said they had to "get the fuck out of there" and told Isaguirre to help him put Smith's body in the trunk. They got back into the car and Valadez drove to an AM/PM, where Melendez bought two cans of Four Loko. While they were driving, Leal stated angrily that "the bitch peed again"—

16

referring to Smith, who had urinated in the back seat of the car before being killed.

Valadez then drove to a Metro PCS mobile phone store because Leal said she needed a new phone. Valadez went into the store with Leal and then came back out without her, saying that Leal was going to go back to her daughters and that he was going to "take care of it." Melendez understood that to mean he would take care of the car and Smith's body.

Valadez drove to Melendez's and Isaguirre's friend's house in Escondido at Melendez's suggestion. They had no plan and were trying to figure out what to do next. Melendez asked her friend if she knew anyone who could get rid of a stolen car and her friend said she might know someone. Valadez and Melendez then left the friend's house while Isaguirre stayed there. As they were leaving, Valadez told Melendez that when it "was all said and done, he was gonna get rid of any loose ends." He said that Isaguirre was a "loose end, because if he were to get in an interview room, he would crack within 20 minutes." Melendez believed Valadez meant he was going to kill Isaguirre.

Valadez and Melendez drove around with no particular destination. They ended up at a car wash where Melendez met her friend Jessica R., who suggested stealing tools from Home Depot. Instead, they decided to sell Isaguirre's gun, which he had left in Smith's car. Melendez went with Jessica in her car, and Valadez followed them in Smith's car, and they sold the gun to someone Melendez was connected to through her daughter's uncle, Nestor A. Melendez and Valadez then drove around to various places, including a Home Depot, gas station, Lowe's, and 24-Hour Fitness, and as well as to Little Caesars with Melendez's ex-husband and children. Melendez also had Valadez drive her to meet one of her friends at a church and to see her then-girlfriend. Melendez was high during all of this. While Melendez and

17

Valadez were at the gas station, Valadez wiped Smith's phone down and threw it into a dumpster.

At some point, Isaguirre called Leal and said he was getting calls from Smith's mom, and he had told her he did not know where Smith was. Valadez and Melendez picked Isaguirre up and Isaguirre told them to go toward Valley Center. They went to a gas station and when Valadez and Melendez came back to the car, Isaguirre was gone. They decided to leave without him because Valadez wanted to get high. They saw Isaguirre again as they were leaving, but Melendez told Valadez to leave him there and they would come back for him.

Melendez directed Valadez to a secluded location she recalled down some rural back roads. Once they got to the location, they took Smith's body out of the trunk and put her on the side of an embankment in the brush. Melendez remembered Smith had scratched her and poured a can of Four Loko on Smith's hands to wash away any evidence. Melendez thought her skin might be under Smith's fingernails and did not feel comfortable leaving her there, so she looked around the car, found garden shears in the trunk, and used them to cut off Smith's fingertips to get rid of any DNA. Melendez put the fingertips and shears in a bag and then put them in her purse. Valadez then kicked Smith's body farther down the embankment at Melendez's suggestion that they should conceal the body better. A couple of days later, Melendez threw the severed fingertips into a fire at her friend's house and threw the shears out of a car while on a freeway overpass.

Melendez and Valadez left the car near an apartment complex somewhere in Temecula. Valadez sprayed the car with WD-40, which he said would get rid of fingerprints, and dropped the WD-40 and car keys in a dumpster.

Melendez called Jessica for a ride, and she picked them up. They went to a casino and a few other places. Eventually, Melendez and Valadez got a ride back to San Diego, got into an argument, and went their separate ways. Melendez did not speak to Valadez or Isaguirre again. She did not see Valadez, Isaguirre, or Leal again until they were all in court.

Melendez was previously convicted of possession of a stolen vehicle, vehicle theft, false imprisonment, and drug-related offenses. She signed a cooperation agreement in this case and requested protective custody. Leal told people that Melendez was a snitch, and Melendez was concerned for her safety.

Melendez admitted to exchanging letters with Pereira while the two were in jail but did not recall telling Pereira that she should have her lawyer contact Melendez's lawyer. She denied telling Pereira that everything was Leal's fault. She also denied telling Pereira to keep Smith in Leal's house and denied telling Pereira to have Smith call her friend back, who she had messaged for help, to tell him everything was okay. Melendez did not recall taking Pereira's phone or deleting anything from it.

6. *Cell Phone Data and Surveillance Video Footage*

During the police investigation, data was extracted from Leal's, Melendez's, and Smith's phones, and police also obtained Facebook records from Isaguirre and Smith's friend Jose. The cell phone data showed communications between Leal, Isaguirre, Melendez, and Valadez's girlfriend, Mary V., before and after the murder. The prosecution presented a visual timeline created by a senior crime intelligence analyst for the district attorney's office that showed certain messages and calls to and from Smith, Leal, Melendez, Isaguirre, Pereira, Mary, and Jose between October 1 and 6 of 2017.

19

Smith's phone was near her home at 10:44 p.m. on October 2 and then utilized cell towers in National City between 12:30 a.m. and 6:40 a.m. on October 3. The cell phone data showed that Smith texted Jose at 1:00 a.m. on October 3: " 'I kind of need you.' " At 2:32 a.m., she texted him, " 'help.' " At 3:18 a.m., Jose texted back, "Hey, Alex, sweetheart, I just saw ur message," and then immediately followed up: "U know I'll do what u ask." At 4:30 a.m., Smith texted Jose: " 'I'm in national city being held against my will. Don't call me, please.' "

Also on October 3, Melendez's and Leal's phones used towers near Soapy Joe's at around 2:16 a.m. and in the Escondido and North County area between 4:24 and 6:00 a.m., before returning to National City. At 6:04 a.m., Leal texted Mary: "R u up its emergency [*sic*] . . . I need [Valadez] to call me asap." The two exchanged a few more texts and calls, and then Leal texted Mary at 8:09 a.m.: "Look I'll tell u later please I need [Valadez] to meet me asap please I need to ask him something and its like FuCK." Mary asked what was going on, and Leal responded: "I will in person but I need to talk to him I fucked up."

At approximately 8:00 a.m., Leal's and Melendez's phones were near a Walmart. At approximately 10:00 a.m., Melendez's phone was in the area of another Walmart. At 11:22 a.m., Melendez's phone was in the Descanso area. At approximately 12:30 p.m., Melendez's phone was in the area near the Metro PCS mobile phone store in Lemon Grove. At 1:31 p.m., Leal's second phone was active in the same area. Melendez's phone was then active in various areas in North County.

At 3:51 p.m., Leal sent an e-mail to her boyfriend Perez while he was still in custody. In the e-mail, Leal explained she had been "on a mission to get" Perez's bail money, but she got "distracted" playing the "game with some

20

girl" that she had previously wanted Perez to "play" with her ex-husband. Leal wrote: "I played that game with some girl and I really screwed up because I won the game." She further stated: "I wanted one more night with you and this girl messed it all up and now my whole life is messed up."

At 1:35 a.m. on October 4, Melendez's phone was in the Temecula area near the location where Smith's body was later discovered. At 2:17 a.m., Melendez's phone was in the area where Smith's car was later found.

Surveillance footage and receipts also confirmed the testimony that various combinations of Leal, Valadez, Isaguirre, and Melendez had been at Walmart, Metro PCS, 7-Eleven, Lowe's, Home Depot, Soapy Joe's, and gas stations throughout San Diego County at various points from October 2 to 4. Leal and Melendez were captured on surveillance footage with Smith's vehicle at Soapy Joe's at around 2:30 a.m. on October 3. Valadez and Melendez were captured on surveillance footage driving Smith's vehicle to and from a Walmart in Chula Vista between 10:00 and 10:30 a.m. on October 3. The interior Walmart surveillance video showed them purchasing a red gas can, gloves, rope, a plastic tarp, and white duct tape. They were also shown on surveillance video with Smith's vehicle at a 7-Eleven in Vista around 6:30 p.m. the same day. Melendez was captured on a surveillance video getting out of Smith's vehicle at a Lowe's hardware store in Vista and then leaving just before 7:00 p.m.

7. *DNA Evidence*

Police executed a search warrant at Isaguirre's parents' house and retrieved a pair of gloves. The interior of the tested glove had a mixture of four contributors, with "extremely strong support" for Valadez and Smith and limited support for Isaguirre. The exterior of the glove also had a mixture of

DNA from four contributors, with "extremely strong support" for Isaguirre and Smith.

The plastic bag and duct tape collected during the autopsy were processed for fingerprints and DNA, but none of the fingerprints from the bag or tape were suitable for comparison. DNA results from the tape around Smith's head included a mixture of three contributors. Smith was assumed to be one of the contributors, but the results were inconclusive for Leal, Valadez, Melendez, Isaguirre, and Pereira because there was not enough DNA on the samples. There was also insufficient DNA obtained from the plastic bag and the tape around the bag.

DNA results from the interior tape on Smith's wrists showed a mixture of two contributors. It was assumed Smith was one of the contributors, but there was not enough DNA to make a comparison for the second contributor. DNA taken from the end of the tape on the exterior end contained a mixture of four contributors. Smith was assumed to be the largest contributor, and there was extremely strong support for the inclusion of Leal as the second largest contributor. Isaguirre, Melendez, and Pereira were excluded as contributors, and the results for Valadez were inconclusive. It is possible for DNA to transfer from one item to another, and there is no way to determine how or when the DNA got onto the items.

8. *Undercover Operation with Isaguirre*

On October 13, police placed an undercover deputy and a cooperating individual in a jail cell with Isaguirre and recorded their conversation. Isaguirre vaguely referenced the murder, asking whether the police could do anything if they did not have a body. When the undercover deputy asked about a gun, Isaguirre responded that there was no gun and said, "bag, duct tape, bag-no air." When asked if his fingerprints were on the bag, Isaguirre

22

responded, "I don't know cause I just grabbed it from the back seat."  He also said they tried to do a "hot one" first and mentioned that the victim had sent a text saying she was being held hostage in National City, but they made her call the person back and say everything was okay.

9.  *Informant Conversation with Valadez*

In November 2017, a cooperating individual (CI) working with detectives recorded a conversation with Valadez in which he talked about the incident.  Valadez mentioned Leal, Melendez, and Isaguirre by name, and he referred to Smith as " 'that bitch' " or " 'that white bitch.' "  The CI, who was familiar with Valadez, told him Leal was going to "flip" on him.  Valadez responded he was not worried about Leal but was worried about Isaguirre.  Valadez explained that Leal had told him that a "fool from Lomita and this bitch had took her kids."  When he got to Leal's house, though, he learned that Villanueva had picked up Leal's daughters.  Valadez told the CI that when he asked Smith what her purpose there was, she started rambling and said she knew people from "Eme."  Valadez tried to find out what contacts she had in "Eme," and he could tell she was lying because she was naming people who had not "been out for a long time."  Valadez told the CI, "I'll be real with you[,] at the end of the day, it comes down to it, Ima Ima Ima fucking just tell the god damn truth.  Look homes, I, I did do that, I fucking got rid of the body so what dude?  Give me my ten years.  Fuck that punk, he's fucking, he did what he did.  Fuck that bitch, she did what she did . . . ."  The CI asked about Leal, "You don't be trippin on her though for shit?"  Valadez said no.

B. *The Defense*

  1. *Evidence Contradicting Melendez's Testimony*

Melendez's ex-husband contradicted Melendez's claim that she had gone to Little Caesars Pizza with him and their children shortly after the murder. Nestor, the uncle of Melendez's youngest child, testified that he did not meet with Melendez to buy a gun or facilitate her sale of a gun in October 2017.

Melendez's best friend of many years, Derek C., had spoken to Melendez about the crime before she was arrested and later spoke with police in June 2019. He was questioned at trial by defense counsel about discrepancies between what he told police and Melendez's trial testimony. Derek previously told police that Melendez told him she had gone back to Smith's body a couple of days after they left it to cut off her fingers and that she tried to put the fingers in bleach. He further told police that, according to Melendez, she got the scratch on her chest from Smith either while they were attempting to give Smith the hot shot or during the suffocation of Smith in the car. Derek also told police that Melendez "can sell ice cream . . . to an Eskimo" when she is "running a hustle on somebody."

On cross-examination, Derek confirmed that he had also told police that Melendez told him that Leal and Valadez came up with the plan to kill Smith, Leal and Isaguirre killed her, and Isaguirre and Valadez put her body in the trunk. However, he told police that Melendez said Leal had told Isaguirre he was going to have to strangle the victim to kill her, and that Isaguirre did not do it to Leal's liking, so she finished it.

  2. *Valadez's Testimony*

Valadez testified on his own behalf. He met Leal through a childhood friend in 2005. He met Isaguirre through Perez in 2017. In the fall of 2017,

24

Valadez was living with his then-girlfriend Mary. Around that time, Leal was talking about leaving her two daughters in Valadez's custody; she wanted to "get herself together" because "she knew that her daughters deserved better."

On October 3, 2017, Valadez woke up and Mary told him Leal contacted her on Facebook and was trying to contact him. Valadez met with Leal at Walmart, and she told him she needed him to go to her house because her daughters were being held. Leal appeared tired, stressed, and on methamphetamine. She had previously told Valadez that her ex and his family threatened to kidnap her daughters. They left Walmart and headed to the car Leal pointed out. Valadez recognized the driver, Melendez, as someone he had slept with on numerous occasions. Valadez drove over to Leal's house because he cared about her daughters and also because he had been sober for 10 or 11 days and he saw it as a chance to get high.

Valadez arrived at the house and did not see Leal's daughters. He went into Leal's room and saw Isaguirre on the couch and Smith sitting on the edge of the bed. Isaguirre appeared to be "pretty high" and "zoned out." Valadez began questioning Smith about what was going on, and she became aggressive and started telling him "who she knew." Smith brought up "Eme," or the Mexican Mafia, and was telling lies about who she knew. Valadez started getting irritated and asked her where Leal's daughters were, and Smith said she just wanted to go home to her daughter. Valadez was baffled. He realized everyone was on methamphetamine and he was frustrated with Leal. He heard the front door open and went and told Leal, " 'This is a bullshit story. I shouldn't be here.' " He denied saying that anyone should kill Smith, and he did not know about the text Smith sent her friend Jose until later.

25

Valadez asked Melendez for a pipe, some methamphetamine, and a ride home, and then he went into the garage to get high. Valadez smoked "as much as [he] could" and did not know how long he was in the garage by himself. Melendez then opened the garage door and backed a car in. She took a hit off the pipe, caught up with Valadez, and said she would take him home.

After they got into the car, Melendez informed Valadez they were going to Walmart to get a few things. As they pulled into Walmart, Melendez told him the real reason they were at Walmart was because she " 'got into it with that white bitch at the house,' " it was a long story, Smith had "scratched the fuck" out of her, and she had to " 'get rid of that bitch.' " Melendez told Valadez they needed to " 'get some stuff to get rid of the body.' " Valadez asked what she meant by "we." Melendez replied that no one was going to believe that he was in the garage smoking when it happened, and his fingerprints were now inside the car of a dead woman. Valadez was very high and believed he was in a "fucked-up position."

Once they were inside Walmart, Melendez told Valadez she had to make some calls and instructed him to grab whatever he thought they would need. He pushed a cart around the store and got a tarp, rope, a gas can, and gloves. He had no money to pay for the items. Melendez gave him money for some of the items and he stole the rest.

As Melendez and Valadez were driving back to Leal's house, they saw Leal walking down the street. Leal said she had gone to the store to buy a drink. They picked Leal up and returned to her house. When they got there, Valadez saw Smith dead on Leal's bed. Melendez instructed Valadez to reverse the car into the garage and told Isaguirre to get the Walmart bag from the car. Both did what they were told. When Valadez returned to Leal's

26

bedroom, he saw Smith's head wrapped in the Walmart bag and tape. Valadez was in shock and Melendez told him to stop tripping and to hurry because they needed to get the body out of there.

Valadez and Isaguirre wrapped Smith in the blanket she was laying on and when they attempted to move her, Smith's hands fell out. Melendez told Leal to wrap Smith's hands with duct tape and she did. Valadez and Isaguirre then carried Smith out to the car and Isaguirre opened the trunk. Melendez told Valadez to get the rest of the stuff from the Walmart bag. When he came back to the garage, Leal, Melendez, and Isaguirre were already in the car and the driver's door was open for him.

Valadez drove the group to a remote area, where they parked and all got out of the car, but he claimed Smith was not killed there. The group then went to an AM/PM store because someone wanted to get a drink. Next, they went to a Metro PCS store because Leal wanted a new phone, and they left Leal there at Melendez's urging. Valadez saw it as an opportunity to get Leal away from the situation. Leal was like family, he loves her, and he did not want her to stick around longer than she had to.

After that, Valadez drove to North County, and he and Melendez left Isaguirre at a friend's house. Valadez denied calling Isaguirre a "loose end." At some point, Valadez and Melendez went to a car wash, where they met up with Melendez's friend Jessica. Valadez also drove Melendez to Home Depot and Lowe's. They also went to a 7-Eleven, where Valadez said it was Melendez, not him, who wiped down Smith's phone and threw it away. Melendez said, " 'This whole shit started behind that phone,' " but he did not know what she was talking about.

Melendez then directed Valadez to the area where they left Smith's body. He and Melendez removed Smith's body from the trunk and moved it

into the brush. There was no embankment, and he did not kick the body. Melendez told him she needed to "clean up [Smith's] fingers because of the scratch" and went over to where the body was. He did not see her do anything to the body. When she got back in the car, she said she would have to come back later because it was dark.

After that, the two of them drove to 7-Eleven and Melendez bought a can of WD-40. She said they needed to dump the car soon because it could be reported stolen. Valadez got on the freeway and, after a couple of exits, Melendez pointed out an apartment complex she said would be a good spot to leave the car. After he parked, Melendez sprayed the car with WD-40, threw away the keys, and called Jessica for a ride. While they were waiting for a ride, he and Melendez "smoked some more dope" and "fooled around." He was arrested about a month later.

Valadez stated that they never met with Melendez's ex-husband and kids. He also never saw a gun and did not know anything about selling a gun. Valadez also denied participating in a hot shot and said he was not present when Smith was killed and did not know she was dead before he went to Walmart with Melendez.

Regarding his conversation with the CI, Valadez agreed that he told the CI that Jonnie was likely to snitch, but Valadez was not actually worried about it. When Valadez told the CI, "she did what she did," he was referring to Melendez, not Leal. When he said, "he did what he did," he was referring to Isaguirre bringing Smith to Leal's house.

Valadez did not know what happened or what anyone did at Leal's house before he arrived. When he was with Leal that day, he did not see her enraged or angry, and he never saw her do anything to Smith.

Leal and Isaguirre did not testify.

28

C. *Jury Verdict and Sentencing*

Leal was prosecuted for murder under multiple theories: premeditation and deliberation, aiding and abetting, conspiracy, and felony murder based on the underlying crimes or robbery and kidnapping. The trial court instructed the jurors that they need not agree on the theory, but they must unanimously agree on the degree of murder.

After the joint trial of Leal, Valadez, and Isaguirre, the jury found Leal guilty of first-degree murder and found true the robbery and torture special circumstances. The jury hung on the kidnapping special circumstance, and the court dismissed that allegation on the People's motion. The jury hung 11 to 1 for guilt as to Isaguirre and agreed on guilt as to Valadez but could not agree on the degree of the murder. The court declared mistrials as to both codefendants.

The court sentenced Leal to life in prison without the possibility of parole.

DISCUSSION

I

Leal argues there is insufficient evidence to support her conviction for first degree murder and the true findings on the special circumstances. Her argument is based primarily on the contention that there is insufficient evidence to corroborate the accomplice statements and testimony given by Melendez and Pereira. (§ 1111.) We therefore begin by considering the corroboration question.

A. *Corroboration of Accomplice Testimony*

Section 1111 provides that "[a] conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the

offense . . . ." Because accomplice testimony "comes from a tainted source and is often given in the hope or expectation of leniency or immunity" (*People v. Wallin* (1948) 32 Cal.2d 803, 808), the Legislature has determined that such testimony by itself is insufficient as a matter of law to support a conviction. (*People v. Romero and Self* (2015) 62 Cal.4th 1, 32 (*Romero and Self*).)

In determining whether other corroborating evidence "tend[s] to connect the defendant with the commission of the offense" (§ 1111), the entire conduct of the parties and their relationships may be taken into consideration by the trier of fact. (*People v. Rodriguez* (2018) 4 Cal.5th 1123, 1128.) The other corroborating evidence need not by itself establish every element of the crime or independently establish the identity of the victim's assailant. (*People v. Abilez* (2007) 41 Cal.4th 472, 505–506 (*Abilez*).) Nor must the evidence corroborate the accomplice as to every fact to which they testify. (*People v. Davis* (2005) 36 Cal.4th 510, 543.) Moreover, the corroborating evidence may be circumstantial or slight and entitled to little consideration when standing alone. (*Romero and Self, supra*, 62 Cal.4th at p. 32.) Thus, the corroborating evidence itself need not be substantial. (*Abilez*, at p. 505 ["to the extent defendant argues that evidence corroborating [the accomplice]'s statement must be substantial, he is mistaken"].)

Leal does not dispute that the trial court correctly instructed the jury on these principles by giving CALCRIM Nos. 335 and 708. These instructions informed the jury that Pereira and Melendez were accomplices, that it could not convict Leal or find true the special circumstances based on their statements and testimony alone, that it should view their statements and testimony with caution, and that it could use their statements and testimony to convict Leal only if it was supported by other independent evidence that tended to connect Leal to the commission of the crime or special

30

circumstances. These instructions further stated that the supporting evidence need only be slight, that it need not be enough to prove guilt by itself, and that it need not support every fact mentioned by the accomplice. The court also instructed that the corroborating evidence may not be the statement or testimony of another accomplice.

Applying these principles, we conclude there was ample independent evidence to corroborate the accomplice testimony and statements of Melendez and Pereira implicating Leal in the murder and the underlying robbery of Smith's car, phone, and clothing. This corroborating evidence included the following: Leal's own messages stating that she was trying to raise bail money for her boyfriend; Leal's communications with Isaguirre and Melendez about Melendez coming over to provide money for the bail; the neighbor's testimony and photograph showing Smith's vehicle at Leal's house in National City on the morning of October 3; his wife's testimony that she heard Leal talking while Smith's car was there; Smith's texts asking for help and stating she was being held against her will in National City; multiple cell phone messages and calls between Leal, Melendez, Isaguirre, and Pereira during the relevant time period; Leal's communications with Mary stating that there was an "emergency," she had "fucked up," and she needed to talk to Valadez; surveillance footage showing that Leal, Melendez and Valadez were using Smith's vehicle the day of the murder; the fact that Smith was wearing different clothing when her body was discovered; the discovery of Smith's phone in a dumpster in Vista; the discovery of Smith's abandoned vehicle in Temecula; the items found in the vehicle matching those Melendez and Valadez purchased at Walmart; cell phone location data showing Leal's and Melendez's movements to Escondido and the North County area and then back to National City on the day of the murder; other surveillance

31

footage and receipts confirming that various combinations of Leal, Valadez, Isaguirre, and Melendez were together at various stores and gas stations in San Diego during the relevant time period; Leal's DNA on the tape taken from Smith's wrist; and Leal's e-mail to her boyfriend after the murder telling him about playing a "game with some girl" and stating that "I really screwed up because I won the game" and "now my whole life is messed up."

Leal does not contend that any of this corroborating evidence was improperly admitted.  In these circumstances, the jury's determination on the issue of corroboration is binding on us unless the corroborating evidence does not reasonably tend to connect Leal with the commission of the crime. (*Abilez, supra*, 41 Cal.4th at p. 505.)  We have no difficulty concluding that the corroborating evidence recited above did reasonably tend to connect Leal with the commission of the murder and underlying robbery.  Thus, there was sufficient independent evidence to corroborate the accomplice testimony and statements of Melendez and Pereira.

B. *Sufficiency of Evidence of Felony Murder and Robbery Special Circumstance*

Leal contends there is insufficient evidence to support her conviction of first degree murder and the true findings on the robbery and torture special circumstances. As noted, the trial court instructed the jury on several theories of first degree murder, but the jury's verdict did not specify which it adopted. Nevertheless, the jury could not have made its true finding on the robbery special circumstance without also concluding that Leal was guilty of first degree felony murder based on her participation in the underlying robbery. Accordingly, we will begin by considering whether there is sufficient evidence to support this theory.

Leal contends there is insufficient evidence of either felony murder or the robbery special circumstance "because there was no substantial evidence that Leal committed, aided and abetted, or was a member of a conspiracy to commit robbery" and "no evidence that a robbery was committed."

In assessing such a sufficiency of the evidence claim, we review the record "in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Zaragoza* (2016) 1 Cal.5th 21, 44.) We "presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*Ibid.*) Even where the evidence of guilt is largely circumstantial, a reviewing court's task is not to resolve credibility issues or evidentiary conflicts, nor is it to inquire whether the evidence might reasonably be reconciled with the defendant's innocence. (*Ibid.*) Rather, the sole relevant question for purposes of substantial evidence review "is

whether, in light of all the evidence, '*any* reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.' " (*Ibid.*)

The trial court instructed the jury with CALCRIM Nos. 540A and 540B on first degree felony murder based on the underlying crime of robbery or kidnapping, CALCRIM Nos. 703 and 730 on the robbery-murder special circumstance, and CALCRIM No. 1600 on the elements of robbery. Generally speaking, these instructions stated that someone who intentionally participated in a robbery resulting in the victim's death is guilty of first degree felony murder and the robbery special circumstance if she was the actual killer, or she assisted the actual killer with intent to kill, or she was a major participant in the robbery who acted with reckless indifference to human life. Leal does not contest any of these jury instructions.

CALCRIM No. 1600 stated the elements of robbery as follows: (1) the defendant or another perpetrator took property that was not his or her own; (2) the property was in the possession of another; (3) the property was taken from the other person or her immediate presence; (4) the property was taken against that person's will; (5) the defendant or another perpetrator used force or fear to take the property or to prevent the person from resisting; and (6) when the defendant or another perpetrator used force or fear, he or she intended to deprive the owner of the property permanently or to remove the property from the owner's possession for so extended a period of time that the owner would be deprived of a major portion of the value or enjoyment of the property.

As we shall explain, we conclude the totality of the evidence here established all the elements of a robbery and Leal's knowing and intentional participation in the robbery. The entire sequence of events began because Leal was desperate for money to bail out her boyfriend. When Melendez

34

arrived and Leal realized she did not have the bail money, Leal announced that the new plan was to rob someone. Thus, Leal herself conceived of the idea to commit a robbery. Smith arrived at Leal's house a little later with Isaguirre.

At some point after Smith arrived, she became upset and said she wanted to leave. Leal slapped her in the face and caused her nose or lip to bleed. Pereira later heard Smith scream while Smith was in Leal's bedroom with Leal, Melendez, and Isaguirre. Leal and Melendez then emerged from the bedroom with Smith's car keys and took off in Smith's car. Before leaving, Leal instructed Pereira not to allow Smith to call anyone or go anywhere. While Leal and Melendez were gone, Smith texted Jose for help and told him, "I'm in national city being held against my will." After Leal learned about Smith's text and returned home with Melendez, she told Pereira, "We have this bitch's car sold." Smith was pleading with them to let her go. Leal was upset and kicked Smith in the upper chest or facial area. Leal also hog-tied Smith on the bed with phone chargers and tried to forcibly inject Smith with a "hot shot." Leal and her cohorts continued to use Smith's vehicle for the rest of the day until they took her to a remote area, killed her in her own vehicle, disposed of her body, and eventually abandoned the vehicle in Temecula. In the course of these events, the participants also took Smith's purse, clothing, and phone and disposed of them at Leal's direction.

From this evidence, the jury could reasonably conclude that a robbery was committed and that Leal knowingly and intentionally participated in the robbery by taking or assisting in the taking of Smith's property against her will, by means of force or fear, with the intent to permanently deprive her of the property. Having found sufficient evidence to corroborate the accomplice testimony of Melendez and Pereira, we must reject Leal's argument that

there is insufficient evidence to support the jury's findings on these elements of felony murder and the robbery special circumstance.

Leal does not contest any of the other elements of liability for first degree felony murder based on an underlying robbery or the robbery special circumstance. In another section of her opening brief, however, she argues there was insufficient evidence she killed or intended to kill Smith. For both a felony murder conviction and the robbery special circumstance, the prosecution was required to prove one of the following: (1) Leal was the actual killer, or (2) Leal aided, assisted, or commanded the actual killer with intent to kill; or (3) Leal was a major participant in the underlying robbery who acted with reckless indifference to human life. (§§ 189, subd. (e)(1)–(3), 190.2, subds. (b)–(d).)

Substantial evidence supported a jury finding that Leal was the "actual killer." (§§ 189, subd. (e)(1), 190.2, subd. (b).) According to Melendez, Leal taped Smith's hands together, placed the Walmart bag on Smith's head, and started putting tape around her neck before instructing Isaguirre to "finish" the job. Leal's DNA was found on the tape around Smith's wrists. Absent any contrary evidence, the jury could reasonably infer that Leal was also the person who placed the duct tape around Smith's eyes, nose, and mouth underneath the Walmart bag. "The actual killer is the person who personally kills the victim, whether by shooting, stabbing, or—in this case—taping [her] mouth closed, resulting in death by asphyxiation." (*People v. Garcia* (2020) 46 Cal.App.5th 123, 152 (*Garcia*).) The jury could also reasonably infer that Leal admitted to being the actual killer in her e-mail to her boyfriend when she stated that she played the same "game with some girl" that she had previously wanted him to "play" with her ex-husband (whom she feared), and

36

that she "really screwed up because [she] won the game" and "now [her] whole life [was] messed up."

Although Melendez testified that Isaguirre ultimately completed the killing by holding Smith down until she stopped moving, the jury could have found on these facts that there was more than one actual killer. (See *Garcia, supra,* 46 Cal.App.5th at pp. 153–154 [acknowledging possibility of more than one actual killer in cases involving concurrent causes of death]; see also *People v. Hardy* (1992) 2 Cal.4th 86, 193 [acknowledging jury could have found defendant "was one of two or more actual killers"].) Alternatively, the evidence we have recited above was also sufficient for the jury to conclude that Smith aided, assisted, or commanded the actual killer with an intent to kill or was a major participant in the robbery who acted with reckless indifference to human life. (§§ 189, subds. (e)(2), (e)(3), 190.2, subds. (c), (d); *People v. Clark* (2016) 63 Cal.4th 522, 614–623; *People v. Banks* (2015) 61 Cal.4th 788, 797–807.)

We therefore reject Leal's sufficiency of evidence challenges to the first degree felony murder theory and the robbery special circumstance based on her participation in the underlying robbery. Accordingly, we need not decide whether there was sufficient evidence to support the jury's first degree murder verdict on any other theory.

## II

With regard to the underlying robbery, Leal argues that the trial court committed reversible error by instructing the jury in response to a question during deliberations that a person's consent to the use of their property may or may not be revoked upon death. We disagree.

The background is as follows. In its initial instructions to the jury, the trial court gave CALCRIM No. 1600 on the elements of a robbery, including

37

that the property must have been taken against the victim's will and by force or fear.  The instruction defined "fear" to mean "fear of injury to the person" and stated: "An act is accomplished by fear if the other person is actually afraid.  The other person's actual fear may be inferred from the circumstances."  The instruction also stated: "An act is one *against a person's will* if that person does not consent to the act.  In order to *consent*, a person must act freely and voluntarily and know the nature of the act."  The court also gave a kidnapping instruction (CALCRIM No. 1215) with a single definition of "consent."

During deliberations, the jury sent a note to the trial court with multiple questions.  The first question asked: "Regarding consent: Is someone able to give consent if they're under the influence or inebriated?  Can someone give consent under duress?"  The second question asked: "If someone gives consent for the use of their property, is that consent revoked upon their death?  i.e., is it robbery if consent was initially give[n] but the person who gave consent dies in the interim?"  The third question asked: "Please clarify the meaning of coercion, rape, consent[,] duress in legal terms."

After extensive discussion with counsel, the court responded to each of these questions by giving the jury further instructions on consent, duress, coercion, and force or fear.  In its answer to the first question, the court stated: "Duress means a direct or implied threat of force, violence, danger, hardship, or retribution that is enough to cause a reasonable person to do or submit to something that he or she would not otherwise do or submit to.  A person cannot give consent if under duress because that person is not acting 'freely and voluntarily.' "  As to the second question, the court's answer repeated the language of CALCRIM No. 1600 regarding the elements of force or fear and consent, including the definition of "consent" to mean that the

38

person acted "freely and voluntarily and [knew] the nature of the act."  The court also stated in relevant part: "Consent may or may not be revoked upon death, depending on what you find to be the facts.  You may consider whether the person died during the course of the alleged robbery in determining whether the property was taken against the person's will and whether the person consent[ed] to the act."  In its answer to the third question, the court defined "coercion" to mean "any scheme, plan, or pattern intended to cause a person to believe that failing to perform an act would result in serious harm to or physical restraint against oneself or someone else."  The court also informed the jury: "Rape is not a legal term applicable to this case."

On appeal, Leal challenges only the portion of the court's answers stating that consent to the use of property may or may not be revoked upon death.  Leal contends that "[a] person's death does not revoke the consent they gave someone to take or use their property, nor does it transform the other person's possession of the property into a robbery upon death."  In response, the People argue that (1) Leal forfeited this claim by failing to object below; (2) the court's answer was legally correct; and (3) any error was harmless because there was overwhelming evidence Smith did not give free and voluntary consent to the use of her property.

We need not decide whether the court's answer was legally correct or the issue was forfeited.  Even assuming any error, we conclude it would be harmless because no reasonable jury could have concluded on this record that Smith freely and voluntarily consented to the use of her property.  Because no reasonable jury could have concluded that Smith consented in the first place, the court's answer on revocation of consent could not have made a difference to the jury's verdict.

39

There was no evidence at trial that Smith freely and voluntarily consented to the use of her vehicle, phone, or clothing.  Leal and Melendez took Smith's keys and car only after Smith became upset and expressed a desire to leave, Leal slapped her in the face and caused her to bleed, and someone in Leal's group did something to Smith that caused her to scream in the bedroom.  Smith's phone was taken from her only after she was discovered using it to text Jose that she was being held in National City against her will.  Leal also forced Smith to change her clothing around the same time Smith was begging to be released and becoming more nervous and scared.  Afterwards, Leal kicked Smith in the face or head, Leal and/or Isaguirre hog-tied her with phone chargers, and Leal and Valadez pinned her down and tried to forcibly give her a "hot shot" with a syringe.  These facts are entirely incompatible with a finding that Smith gave free and voluntary consent to the use of her property.

The only evidence that Smith gave "consent" to the use of her vehicle was Melendez's testimony that after all the events at Leal's house, when Leal was trying to get Smith to leave with them, Smith began crying and said, "If you just let me go, I won't say anything. . . .  You can even keep the car."  Clearly, no reasonable jurors could have found that this "consent" was given freely and voluntarily; it was given under duress, and it was expressly conditioned on being released, which did not occur.  Accordingly, any error in the court's instruction on *revocation* of consent could not have made a difference to the verdict.

Under either the *Watson* standard of prejudice for state law errors (*People v. Watson* (1956) 46 Cal.2d 818, 836–837) or the *Chapman* standard for federal constitutional errors (*Chapman v. California* (1967) 386 U.S. 18,

24), any error in the trial court's answer to the jury's question on revocation of consent was harmless.

## III

Leal also challenges the sufficiency of evidence to support the jury's true finding on the torture special circumstance and raises a claim of instructional error regarding the torture special circumstance. Because we have found sufficient evidence to support the first degree murder conviction and the true finding on the robbery special circumstance, and we have rejected Leal's claim of instructional error relating to the underlying robbery, we need not decide the validity of the torture special circumstance. The existence of a single valid special circumstance mandates a sentence of death or life in prison without possibility of parole. (§ 190.2, subd. (a).) Thus, a reversal of the torture special circumstance would have no effect on Leal's sentence of life without possibility of parole. (See *People v. Bittaker* (1989) 48 Cal.3d 1046, 1101–1102 [declining to decide challenges to additional special circumstances in capital case because "[a] single valid special circumstance finding is sufficient to determine that defendant is eligible for the death penalty"]; *People v. Dominick* (1986) 182 Cal.App.3d 1174, 1202 ["any error in regard to this special circumstance is harmless under the facts of this case because . . . there is a second special circumstance which must be upheld"].)

## DISPOSITION

The judgment is affirmed.


BUCHANAN, J.

WE CONCUR:


DATO, Acting P. J.


KELETY, J.